O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR WOMACK,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL AMERICAN LIFE INSURANCE COMPANY, PROTECTIVE LIFE INSURANCE COMPANY, THE PAUL REVERE LIFE INSURANCE COMPANY, UNUM, TRAVELERS, THE STANDARD FIRE INSURANCE COMPANY,<br><br>Defendants. | Case No. CV 08-02176 DDP (CTx)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION OF ISSUES**<br><br>[Motion filed on August 17, 2009] |

This matter comes before the Court on the Motion for Summary Adjudication of Issues filed by the defendants General American Life Insurance Company ("General American"), Protective Life Insurance Company ("Protective Life"), and The Paul Revere Life Insurance Company ("Paul Revere") (collectively "Defendants"). Having reviewed the papers submitted by the parties and heard oral argument, the Court grants in part and denies in part Defendants' motion and adopts the following order.

# I. BACKGROUND

## A. Factual History

### 1. Disability Insurance Policies

For 20 years, the plaintiff Arthur Womack ("Plaintiff") owned and operated a general dentistry practice. (Plaintiff's Statement of Genuine Issues ("PSGI") ¶ 30.)[1]

#### a. General American Disability Policy

In 1984, Plaintiff purchased disability insurance from General American. The policy provides for benefits of $5,000 per month for total disability after a 30-day elimination period, which must be satisfied before benefits become payable. The policy provided that "Total Disability and totally disabled mean that, as a result of sickness or injury or a combination of both, you are unable to perform the material and substantial duties of your occupation." (DSUF ¶ 3.)

The policy also includes a proportionate income replacement rider which contains the following definition of partial disability: "Partial Disability and Partially Disabled mean that you are engaged, either full-time or part-time in an occupation, including Your Occupation, but solely because of disability from sickness or injury or both, you are unable to earn at a rate of at least 80% of your Prior Earned Income." (Id.)

---

[1] In his PSGI, Plaintiff responds to the numbered paragraphs from Defendants' Separate Statement of Undisputed Facts ("DSUF"), but begins numbering his additional statements of fact at paragraph 1. The Court will refer to Plaintiff's responses to Defendants' statements of undisputed fact as Plaintiff's Response ("PR") and Plaintiff's separate statements of fact as Plaintiff's Statement of Genuine Issues ("PSGI").

b. General American Business Overhead Expense Policy

In addition, Plaintiff purchased a business overhead expense (BOE) policy from General American, which provided a monthly benefit up to $9,000 to cover eligible business overhead expenses during a total disability after a 30-day elimination period, for a 24-month benefit period. (Id. ¶ 4.) The BOE policy defined total disability as follows: "Total Disability and totally disabled mean that, as a result of sickness or injury or a combination of both, you are unable to perform the material and substantial duties of your occupation." (Id. ¶ 5.)

c. Protective Life Disability Policy

In 1993, Plaintiff also purchased an individual disability policy from Protective Life, which provided a $7,116 per month benefit for total disability after a 90-day elimination period. (Id. ¶ 6.) The policy defines total disability as "injury or sickness restrict[ing] your ability to perform the material and substantial duties of [the insured's] regular occupation to an extent that prevents [the insured] from engaging in [her] regular occupation" so long as the insured is "receiving medical care from someone other than [herself] which is appropriate for the injury or sickness" unless "continued care would be of no benefit to [the insured]."

The policy also defines residual disability, which means that as a result of the same injury or sickness which caused the insured to satisfy the elimination period, she suffers "at least a 20% loss of net income in [her] regular occupation" and is "receiving medical care from someone other than [herself] which is appropriate

for the injury or sickness" unless "continued care would be of no benefit to [the insured]." (Id. ¶ 7.)

2. Plaintiff's Back Injury and Resulting Disability

On July 31, 2004, Plaintiff was a passenger in a boat en route to Catalina Island when a large wave threw him to his seat. Plaintiff was in immediate and excruciating pain, could not walk, and was transported for emergency medical treatment. (PSGI ¶ 31.)

An x-ray taken of Plaintiff's spine at the emergency room indicated a thirty percent anterior compression fracture at the L1 vertebra, mostly acute. (Id. ¶ 12.) The compression at the L1 vertebra was revealed by a later MRI to have predated the boating accident. (Id. ¶ 15; PR ¶ 15.) An MRI performed on August 4, 2004, revealed what Plaintiff's treating physician at the time, Sylvain Palmer, M.D., thought to be a decrease in height at the T12 vertebra "in keeping with the recent compression fracture at this site likely benign." (DSUF ¶ 14; PR ¶ 14.) A contrast MRI performed on August 9, 2004, confirmed the old compression of the L1 vertebra and what Plaintiff's treating physician at the time believed to be a subacute compression fracture at T12 with mild to moderate height loss. (DSUF ¶ 15.) In addition, Plaintiff had severe osteoporosis, which made him susceptible to further fractures. (PSGI ¶ 31.) Because of the location of the fracture, Plaintiff had difficulty bending, twisting, and sitting or standing in a forward leaning position. (Id.)

For four months following the boating accident, Plaintiff underwent conservative treatment consisting of pain medications, injections, a back brace to stabilize the spine, and therapy, all of which were unsuccessful in providing relief. (PSGI ¶ 32.)

Following this unsuccessful course of treatment, Dr. Palmer performed a "kyphoplasty" surgery on November 16, 2004, at both the T12 and L1 vertebrae. (Id. ¶ 33.) In a kyphoplasty, the surgeon inserts a balloon into the affected vertebra, inflates it to increase height, then injects a synthetic cement-like mixture into the area in the hope of maintaining height and affording pain relief to the patient. (Id.) The kyphoplasty for Plaintiff, however, was a failure at the T12 level. According to the operative report, the T12 level was "quite hard" and the balloon could not expand significantly. When the synthetic material was introduced, there was "leakage into the disc space itself," at which point the procedure was stopped. (Id.)

As a result of the failed kyphoplasty surgery at the T12 level, Plaintiff was left with a permanently compressed vertebra and continued to be in pain, particularly when leaning forward. (Id. ¶ 34.) Dr. Palmer declared that Plaintiff was "unable to work and rendered permanently disabled from his career as a dentist because of the fractures in his back." (Id.)

3. Handling of Plaintiff's Insurance Claim

a. Back Injury: 2004-2005

Following the boating accident, in August 2004, Plaintiff submitted a claim under his policies, asserting that he suffered a back injury while boating on July 31, 2004. (DSUF ¶ 8.) Dr. Palmer signed Attending Physician Statement ("APS") forms indicating a vertebral fracture causing total disability and restrictions in bending, stooping, twisting, and lifting. (Id. ¶ 9.) Brian Chenevert, a customer care specialist in charge of administrating Plaintiff's claim, spoke to Plaintiff on September

24, 2004. (Id. ¶ 10.) Plaintiff explained that his back injury occurred when a boat in which he was a passenger hit a large wave. He was taking pain medication and Actonil for his osteoporosis. He went to work once or twice a week to take care of paperwork and did not know when he could return to work, although he suggested it was possible he could return at the end of January. (Id.)

In order to explore Plaintiff's occupational duties, physical demands, and current status, Unum's[2] vocational rehabilitation consultant Deborah A. Horvath, M.A., spoke to Plaintiff on November 2, 2004. (DSUF ¶ 21.) Plaintiff reported the types of procedures he performed as a dentist, the hours he typically worked, and the current state of his practice given his injury. (Id. ¶ 22.)

On November 16, 2004, the same day that Plaintiff underwent the kyphoplasty surgery, Unum's in-house nurse reviewer, Judy Patrock, R.N., advised that Dr. Palmer's restrictions and limitations of "no bending, stooping, twisting, or lifting are reasonable and would, in fact, be not possible [sic] due to the insured's brace." (PSGI ¶ 42.) On November 30, 2004, Unum wrote to Plaintiff, indicating that it had determined he was disabled and entitled to Total Disability benefits under his insurance policies. (Id. ¶ 43.) Defendants sent Plaintiff checks totaling $40,116 covering the period from August 30, 2004 through November 30, 2004. (Id. ¶ 24.) On December 1, 2004, Unum field representative Rick Gaume met with and interviewed Plaintiff and learned he had

---

[2] Paul Revere was the administrator of Plaintiff's policies. Paul Revere is a wholly-owned subsidiary of Unum, and the adjusters that handled Plaintiff's claim were Unum employees. The Court will therefore refer to the company adjusting Plaintiff's claim as Unum and the claims adjusters as Unum employees, for ease of reference.

recently undergone the kyphoplasty surgery, and that it had not resulted in significatn improvement. (Id. ¶ 44.)

From December 2004 through May 2005, Dr. Palmer and Plaintiff submitted supplemental claim forms indicating that Plaintiff remained disabled due to continued pain from the compression fracture. (Id. ¶ 45.) In April 2005, Unum assigned an expected resolution date on Plaintiff's claim indicating he would not recover for another thirteen to twenty-four months. (Id. ¶ 46.) Between May 2005 and May 2006, Unum did not request any progress reports. (Id. ¶ 47.) Plaintiff's claim continued to be paid throughout 2005 and 2006. (DSUF ¶ 25.)

b. Back Injury: 2006

In March of 2006, after a year of inactivity, Plaintiff's file came under the supervision of Jeff Parsons, a Director in Unum's Complex Claims Unit. (PSGI ¶ 48.) On March 6, 2006, Parsons recommended surveillance of Plaintiff "to document time [at] office." (PSGI ¶ 49.) The surveillance did not indicate Plaintiff spent any time at the office; rather, it showed him driving to the University of Southern California ("USC") School of Dentistry, riding the train, and dropping a woman off at the airport, among other things. (DSUF ¶ 27.) This was consistent with a supplemental statement Plaintiff provided to Unum in May 2006, indicating that he had begun to volunteer at USC two to three days per week. (PSGI ¶ 52.)

Unum ordered updated medical records and required Plaintiff to submit an updated attending physician statement ("APS") certifying his continued disability. The APS was provided by his treating endocrinologist Dr. Michael Truong, who was managing Plaintiff's

osteoporosis. (Id. ¶ 53.) Unum received Dr. Truong's APS on June 9, 2006.

Sometime after June 16, 2006, Brian Chenevert wrote to Plaintiff's attorney in a separate lawsuit in which Plaintiff sued the driver of the boat on which he was injured. (DSUF ¶ 33.) Chenevert asked if Plaintiff had any new treatment providers or additional treatment. (Id.) Plaintiff's attorney indicated that they had no new medical records, but sent a transcript of Dr. Palmer's deposition, which was taken on June 16, 2006. (Id.) In the deposition, Dr. Palmer stated that in approximately 25% of the kyphoplasties she has performed, the patients "just do not respond." (PR ¶ 33.) She also indicated that Plaintiff's osteoporosis "makes it less likely that he will heal advantageously," and that Plaintiff was unable to return to dentistry. (Id.)

On November 10, 2006, Unum's in-house consulting physician, Dr. Joel Saks, wrote to Dr. Truong asking about the etiology of Plaintiff's osteoporosis and the existence of any "objective evidence" that Plaintiff's compression fracture at T12 occurred on July 31, 2004. (Id. ¶ 54). Dr. Saks was under the mistaken impression that Plaintiff's coverage under the policies depended on whether his disability was the result of an accident or sickness. (Id. ¶¶ 55-56.) After receiving Dr. Truong's response, Dr. Saks recommended on December 1, 2006, that Plaintiff be examined by an Independent Medical Examiner ("IME"). (Id. ¶ 58.)

c. Tibial Tendon Injury: 2006

On December 14, 2006, Plaintiff faxed a supplemental claim form advising Unum that he had suffered a tibial tendon injury and had undergone surgery as a result:

> I just ruptured my posterior tibial tendon and had a harvest graft, osteotomy, ankle fusion requiring 6 incisions and 52 staples. Left foot cast and non-weight bearing. Friends and girlfriend provide all assistance. I can’t cook, clean, bathe, go alone by myself. I’m totally dependent on others.

(Id. ¶ 59.) After learning of Plaintiff’s tibial tendon injury and resulting surgery, Unum made no effort to communicate with Plaintiff regarding his injury. (Id. ¶ 60.) On December 27 through 29 of 2006, Unum surveilled Plaintiff for nearly 30 hours. The surveillance documented the fact that Plaintiff was on crutches, in a cast, dependent on others, and totally inactive. (Id. ¶ 61.)

d. Dr. Weinstein’s Examination

On January 23, 2007, Unum wrote to Plaintiff advising him it had scheduled a medical examination to be conducted by Dr. Michael Weinstein on February 28, 2007. (Id. ¶ 62.) On the same date, Unum wrote to Dr. Weinstein confirming the exam and enclosing medical records for his review. (Id. ¶ 63.) However, Unum did not mention Plaintiff’s tibial tendon injury, nor did they provide him with information relating to the failure of the kyphoplasty surgery. (Id. ¶ 63.) Unum also provided Dr. Weinstein the surveillance from May 2006, but did not provide the more recent surveillance showing Plaintiff’s inactivity and dependence on

others. (Id. ¶ 64.) Unum asked Dr. Weinstein to report on Plaintiff's thoracic and lumbar range of motion, gait, and the "numerical parameters of time, weight, distance" of Plaintiff's ability for lifting, sitting, standing, walking, bending, and pushing or pulling. (Id. ¶ 65.)

During the examination, Dr. Weinstein was unable to perform a complete physical examination on Plaintiff's lumbar and thoracic spine due to the fact that Plaintiff was in a cast and on crutches. (Id. ¶¶ 65-66.) Dr. Weinstein's report acknowledged that his evaluation was "limited today as [Plaintiff] had recent surgery to his left foot and he was on a low profile walker and was walking with crutches." (Id. ¶ 66.)

Dr. Weinstein acknowledged, however, that Plaintiff had a "30% T12 compression fracture" and suffered from "chronic thoracolumbar pain." (PR ¶ 45.) Dr. Weinstein stated that a "vast majority of individuals" would be able to return to work four to six months after a compression fracture and that he expected Plaintiff should have been able to do the same on that basis. (Id.)

After the examination, Plaintiff realized that Unum had not provided Dr. Weinstein with his actual imaging films, so he later delivered them to Dr. Weinstein personally. After receiving the imaging films, Dr. Weinstein acknowledged in a supplemental report that Plaintiff "does have a significant thoracolumbar kyphosis from the fracture" that would cause pain with prolonged sitting and leaning forward. (PSGI ¶ 67.) Dr. Weinstein opined that in order for Plaintiff to continue working as a dentist, he would need to limit the procedures he performed to ones that would allow him to move around and stretch every hour or two, might have to "modify

his practice," and would need "good body mechanics and ergonomics," such that "the efficiency of his practice might be decreased." (Id. ¶ 67.)

e. Follow-Up Investigation of Dr. Weinstein's Recommendations

Following Dr. Weinstein's supplemental report, Unum did no follow-up investigation concerning whether the work modifications he recommended would render Plaintiff totally disabled under California law. (Id. ¶ 68.) In addition, it never investigated whether the decreased efficiency Dr. Weinstein referenced would entitle Plaintiff to partial disability benefits. (Id.) Unum performed no investigation into the types of modifications that would be required for Plaintiff to return to work, and claims supervisors decided, contrary to Dr. Weinstein's medical advice and without an alternate medical opinion, that ergonomics would not be helpful to Plaintiff. (Id. ¶ 69.)

On March 16, 2007, Unum completed a vocational rehabilitation referral, asking "would any of [Plaintiff's] frequently performed procedures take longer than 2 hours to complete?" (Id. ¶ 71.) In response, Unum's in-house vocational consultant, Gabrielle Allen performed a limited assessment. She was asked only to consider whether Plaintiff's dental procedures required constant sitting for longer than two hours, (PR ¶ 47), but was not asked to consider whether certain procedures required a combination of standing or sitting, (PSGI ¶ 72). After speaking with a dental assistant for her own dentist and a dental consultant she found on the internet, Allen concluded in a March 21, 2007, report that a two-hour

appointment is the longest typically scheduled, which completed her analysis. (Id.)

Parsons concluded that as of the date of Dr. Weinstein's medical examination, Plaintiff was not entitled to disability benefits based on his back condition, but was entitled to further benefits until he recovered from his tibial injury sufficiently to allow him to return to work. (Id. ¶ 73.) On May 11, 2007, Parsons accessed Unum's electronic claims management database to reflect that an "Adverse" decision on Plaintiff's claim was expected to be made effective June 1, 2007. (Id. ¶ 75.) Plaintiff was not advised that Unum had determined that he had recovered sufficiently from his back injury to enable a return to work. (Id. ¶ 74.) At the time Unum made its adverse claim determination, it had not yet received medical records concerning Plaintiff's tibial tendon injury from his treating physician Dr. Smith. (Id. ¶ 76.)

On May 23, 2007, Plaintiff faxed to Unum a supplemental claim form reiterating that he remained unable to treat patients in a leaning forward position due to pain in his back and limitations relating to his tibial injury: "I use a cane. My ability to do what I did as daily activities has been dramatically reduced." (Id. ¶ 39.) On May 29, 2007, Unum reviewed the latest treatment record from Plaintiff's orthopedic surgeon, Ronald Smith, M.D. (Id. ¶ 38.) As of May 14, 2007, Plaintiff was still wearing an ankle/foot brace "most of the time," and was suffering "a feeling of dysesthesias." (Id.) Dr. Smith planned for Plaintiff to continue wearing the brace for three months, followed by re-examination in four months. (Id.) Unum did not follow up with Dr. Smith concerning Plaintiff's continuing treatment or functional

impairment. (Id. ¶ 76.) As of June 2007, Plaintiff was scheduled to undergo six additional weeks of physical therapy for treatment of his left foot and ankle. (Id. ¶ 40.)

f. Sharing Plaintiff's Medical Records

The same day it received Dr. Smith's records, Robert Bernier, who reported to Parsons and was responsible for Plaintiff's claim file, received a call from Travelers Insurance Company ("Traveler's"). The Traveler's representative advised Bernier that his company insured the boat owner in the personal injury suit Plaintiff had initiated and that they were "going to trial" over Plaintiff's claim he was disabled as a result of the boat accident. (Id. ¶ 77.) Bernier knew that Johnson was working for a party adverse to Plaintiff. (Id. ¶ 78.) Nevertheless, Bernier faxed Dr. Weinstein's IME report to the Traveler's representative without Plaintiff's permission. (Id.) Unum's Quality Compliance Consultant could think of no legitimate business purpose for Unum to send Plaintiff's IME report to an adverse party. (Id. ¶ 88, 92-93.) Bernier claimed in his deposition that he mistakenly believed he had been given authorization to release the records and that he had accidentally confused Plaintiff's claim with another claim in which he had "swapped authorizations" with somebody else at Travelers days before. (Id. ¶ 83.) However, Bernier could recall nothing about this other claim, including the location of the insured, the nature of the disability, the insured's gender or the claim status. (Id. ¶ 84.) Bernier claimed he had never before sent or disclosed otherwise confidential information to a liability insurance company whose interests were adverse to his insured. (Id. ¶ 85.)

g. Pre-Denial Investigation Concerning Tibial Tendon Injury

On June 4, 2007, Unum's in-house nurse Andrea Brewster spoke with Plaintiff's physical therapist Jose Fojas at Rehab Alliance. (DSUF ¶ 51.) Brewster summarized Fojas' report as having indicated that there were no standing restrictions and that Plaintiff could walk continuously fifteen to twenty minutes or to the point where he began to experience pain. (Id.) However, Fojas' actual report indicated that Plaintiff did have significant standing restrictions. (PR ¶ 51.) His report indicated that "[m]orning tolerance to standing is higher than late afternoon and evenings" and that "Mr. Womack's symptoms reportedly become much more noticeable after 30-35 minutes of continuous standing." At the end of the day, "onset of symptoms are after approx. 10 minutes of continuous standing." (PR ¶ 51; Coleman Decl. Ex. A at GACL01340.) Dr. Saks reviewed Fojas' conclusions and pointed out that Fojas was not responsible for formulating restrictions or limitations. (DSUF ¶ 53.)

In a June 19, 2007, report, Dr. Saks advised that Plaintiff was only "6.5 months post a major left foot/ankle procedure, involving major tendon transfer, fusion of several bones of the foot with bone harvest and grafting, cutting and realigning the heel bone and the primary metatarsal. Substantial healing from this procedure is expected to take up to a year." (PSGI ¶ 94.) Dr. Saks recommended that "[c]ontinued follow-up of physician and physical therapy notes should help to define status as healing progresses." (Id.)

On the same day, Bernier completed a vocational rehabilitation referral to Gabrielle Allen, this time asking whether Plaintiff could walk from patient room to patient room to perform dental procedures throughout the course of an eight-hour day. (Id. ¶ 95.) Allen opined that with control over the timing of patient scheduling, a dentist would not likely be standing continuously for over thirty minutes, walking fifteen to twenty minutes continuously, or sitting for over two hours without a break. (DSUF ¶ 54.) Allen did not consider whether Plaintiff's ability to operate a foot pedal was impaired by his tibial tendon injury. (Id. ¶ 96.)

h. Review by Quality Compliance Consultant

Without further investigation or analysis, Parsons and Bernier decided on June 20, 2007, to terminate Plaintiff's claim retroactive to June 1, 2007, and referred the file to Unum's Quality Compliance Consultant Mark Reger for approval. (PSGI ¶ 97.) Reger was a Unum employee with over 30 years of disability claims handling experience. (Id. ¶¶ 88-91.)

Reger initially disapproved the proposed denial of Plaintiff's claim, concluding that (1) the file documentation did not support the decision; (2) necessary resources had not been consulted; and (3) the file had not been provided "a thorough, fair, and objective evaluation." (Id. ¶ 98.) Reger noted that Plaintiff "would have some restrictions relative to the amount of time that he could work, need for breaks, etc." (Id.) In addition, Reger noted that because Plaintiff had two separate medical conditions– the T12 compression fracture and the tibial tendon injury– a co-morbid review should be conducted. (Id.) Finally, Reger noted that

California's legal definition of disability needed to be taken into account and that Unum should evaluate Plaintiff's possible entitlement to partial disability benefits. (Id.)

Parsons had a "professional disagreement" with Reger. (Id. ¶ 99.) He claimed the co-morbid review had been performed by Dr. Saks, but was not worded clearly. (Id.) Parsons instructed Dr. Saks to insert a sentence in his June 19, 2007, report to state that he had considered all pertinent medical conditions. (Id.) Dr. Saks did so by way of an addendum dated June 26, 2007. (Id. ¶ 100.) No co-morbid review to assess the combined effects of Plaintiff's injuries was actually performed, although such a review is required by Unum's claims manual. (Id. ¶¶ 101, 106.)

Parsons and Bernier refused to conduct further investigation of Plaintiff's entitlement to benefits in light of California's definition of disability; rather, they inserted an additional sentence into their denial letter. In addition, they refused to conduct any vocational or financial investigation into whether Plaintiff would suffer at least a twenty percent loss of income upon a return to work as a dentist and thereby be entitled to partial or residual disability benefits. (Id. ¶¶ 102-04.) Instead, they included a reference in the new denial letter to the policy's partial disability benefits provision, together with a statement that "it is within reason to expect you are able to return to work in a significant capacity and that any decrease in efficiency would not be large enough to generate a 20% loss of earnings (the required minimum loss under Residual Disability)." (¶¶ 102-04.)

On June 27, 2007, the file was again referred to Reger for approval of denying Plaintiff's claim. (Id. ¶ 105.) Reger approved the denial that same day, although he later admitted no co-morbid review had not actually been performed and that he believed the denial of residual disability benefits by Parsons and Bernier was based on speculation. (Id. ¶¶ 107-08.) The denial letter, dated June 28, 2007, was sent to Plaintiff the next day.

i. Plaintiff Disputes Claim Denial

Plaintiff disputed the denial to Unum, and his treating physicians, Drs. Truong and Palmer, sent letters advising Unum that Plaintiff remained disabled. (Id. ¶ 109.) Furthermore, Dr. Palmer recommended that Unum obtain a Functional Capacity Evaluation (FCE) to objectively assess Plaintiff's work tolerance. (Id.) In response, Dr. Saks advised, without explanation, that such an evaluation would be "unlikely to provide useful information," notwithstanding the fact that he has recommended FCEs in the past and has done so as recently as 2009. (Id. ¶ 112.) Without further investigation or analysis, Plaintiff's claim was again denied by letter dated January 11, 2008.

**B. Procedural History**

On March 4, 2008, Plaintiff filed suit against General American, Protective Life, The Paul Revere Life Insurance Company, Unum, Travelers, and the Standard Fire Insurance Company (collectively "Defendants") in Los Angeles Superior Court. Plaintiff raises causes of action for (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) intentional interference with prospective economic advantage; (4) invasion of privacy; and (5) conspiracy. Plaintiff prays for

special damages, general damages, punitive damages, and attorneys' fees and costs.

On April 2, 2008, Defendants removed to this Court on the basis of diversity jurisdiction. On April 9, 2008, Defendants Paul Revere, General American, and Protective Life filed an Answer. (Docket No. 6.) On April 17, 2008, Defendant The Standard Fire Insurance Company filed an Answer. (Docket No. 11.)

On August 17, 2009, Defendants Paul Revere, General American, and Protective Life filed this Motion for Summary Adjudication of Issues. Defendants argue that (1) there is no triable issue as to whether Defendants acted in bad faith; (2) Plaintiff's claims for intentional interference with prospective economic advantage, invasion of privacy, and conspiracy fail as a matter of law; (3) Defendants are entitled to summary adjudication of Plaintiff's punitive damages claim; and (4) the breach of contract and bad faith claims must be dismissed against Paul Revere.

**II. LEGAL STANDARD**

Summary adjudication of an issue is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" on that issue. FED. R. CIV. P. 56(c). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in favor of the nonmoving party. Id. at 255.

**III. DISCUSSION**

**A. The "Genuine Dispute" Doctrine as Applied to "Bad Faith"**

An insurer "must give at least as much consideration to the [insured's] interests as it does to its own." Egan v. Mutual of Omaha Ins. Co., 24 Cal. 3d. 809, 818-19 (1979) (citations omitted). An insurer cannot "reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial." Id. The burden is on the insurer to seek out information relevant to a claim. Id. Furthermore, insurers must communicate with the insured and her physicians in a "manner calculated to elicit an informed response." Hughes v. Blue Cross of Northern California, 215 Cal. App. 3d 832, 846 (1989).

A breach of the implied covenant of good faith and fair dealing requires more than just a breach of the contractual duty itself, because bad faith implies unfair dealing rather than mistaken judgment. Chateau Chamberay Homeowners v. Associated Int'l Ins. Co., 90 Cal. App. 4th 335, 345 (2001) (citing Congleton v. Nat'l Union Fire Ins. Co., 189 Cal. App. 3d 51, 59 (1987)). The ultimate test of bad faith liability is whether the refusal or alleged delay in paying was unreasonable. Id. at 346 (citing Opsal v. United Servs. Auto. Ass'n 2 Cal. App. 4th 1197, 1205 (1991)). While reasonableness is ordinarily a question of fact, it becomes a question of law where the undisputed evidence only leads to one reasonable inference. Id. (citing Paulfrey v. Blue Chip Stamps, 150 Cal. App. 3d 187, 196 (1983)).

A mistaken or erroneous denial of benefits can be reasonable if there is a legitimate dispute as to the insurer's liability. Id. (citing Tomaselli v. Transamerica Ins. Co., 25 Cal. App. 4th

1269, 1280-81 (1994)). Before an insurer can be found to have acted in bad faith, "it must be shown that the insurer acted unreasonably or without proper cause." Id. (citing Dalrymple v. United Serv. Auto. Ass'n, 40 Cal. App. 4th 497, 520 (1995) (emphasis in original)). But when there is a genuine issue as to the insurer's liability, "there can be no bad faith liability imposed on the insurer for advancing its side of that dispute." Id.

The settled law in California is that when there is a genuine dispute as to the amount of the insured's claim, the insurer is not liable for bad faith. Id. (citing Fraley v. Allstate Ins. Co., 81 Cal. App. 4th 1282, 1292 (2000)). But claims of bad faith cannot be defeated by the "genuine dispute" doctrine if: (1) the insurer was guilty of misrepresentation during its investigation; or (2) its employees lied to the insured or lied in depositions; or (3) the insurer dishonestly selected experts; or (4) the insurer's experts were unreasonable; or (5) the insurer failed to conduct a thorough investigation. Id. at 348-49 (citing Guebara v. Allstate Ins. Co., 237 F.3d 987, 996 (9th Cir. 2001)). Furthermore, granting summary judgment to the defendant on the basis of the genuine dispute doctrine is only appropriate when it is "indisputable that the basis for the insurer's denial of benefits was reasonable." Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152, 1161 (9th Cir. 2002); Wilson v. 21st Century Ins. Co., 42 Cal. 4th 713, 724 (2007).

The Court finds there is evidence from which a reasonable juror could conclude that Defendants acted in bad faith. When Unum denied Plaintiff's claim, it knew that (1) he had chronic back

pain, particularly with forward-leaning movements, and according to Dr. Weinstein would have to modify his practice to accommodate a return to work, which would result in decreased efficiency, (PSGI ¶ 67); (2) he was wearing a brace, required the use of a cane, and would have a decreasing ability to stand as the day progressed, (id. ¶ 39; PR ¶ 51); and (3) he was only half-way through the expected recovery time from his reconstructive surgery (PSGI ¶¶ 38, 94).

Defendants' Quality Compliance Consultant believed that the denial of Plaintiff's claim was not supported by his file, particularly since a co-morbid review had not been conducted, no one at Unum had considered how California's definition of total disability applied to Plaintiff's claim, and no one had assessed Plaintiff's entitlement to partial or residual disability. (Id. ¶¶ 88-91.) Although Reger approved the denial after Parsons directed Dr. Saks to insert additional language in his report, he later acknowledged in his deposition that no co-morbid assessment had actually been performed and that the denial of partial disability was based on speculation. (Id. ¶¶ 107-08.) No one at Unum had spoken to Plaintiff regarding his tibial tendon injury or concerning the fact that an adverse claims decision had been made. (Id. ¶ 60.) Nor did Defendants consult with Drs. Truong, Smith, and Palmer prior to denying Plaintiff's claim.

The Court finds that these decisions by Defendants could support the conclusion that Defendants acted in bad faith with respect to Plaintiff's claim. See, e.g., Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan, 85 F.3d 455, 459 (9th Cir. 1996) (rejecting interpretation of "total

disability" under own-occupation clause to include modifications of insured's work); Delgado v. Heritage Life Ins. Co., 157 Cal. App. 3d 262, 277-78 (1984) (holding insurer's unreasonable interpretation of its own policy provisions to exclude coverage is bad faith); Davis v. Blue Cross of Northern California, 25 Cal.3d 418, 427 (1979) (finding bad faith where insurer failed to bring necessary information to the attention of its insured); Miller v. Nat. Am. Life Ins. Co., 54 Cal. App. 3d 331, 339 (1976) (noting that adopting an unduly restrictive interpretation of medical information supports a fraud claim against insurer).

It would be inappropriate to grant summary adjudication on the basis of the "genuine dispute" doctrine where there is evidence from which a reasonable jury could conclude that Defendants failed to conduct a thorough investigation and were determined to drop Plaintiff's coverage notwithstanding the fact that their own medical expert's opinions suggested a contrary result. See Chateau Chamberay Homeowners, 90 Cal. App. 4th at 348-49 (citing Guebara v. Allstate Ins. Co., 237 F.3d 987, 996 (9th Cir. 2001)). Furthermore, there is evidence that at least one of Unum's employees, Bernier, may have lied during his deposition concerning his decision to release Plaintiff's medical records to an adverse party. See id. (holding bad faith claim cannot be defeated by the "genuine dispute" doctrine if insurer's employees lied during depositions). The Court therefore denies Defendants' motion with respect to Plaintiff's cause of action for breach of the implied covenant of good faith and fair dealing against General American and Protective Life.

**B. Plaintiff's Privacy Related Claims**

In its Opposition to Defendants' motion, Plaintiffs concede that there is no genuine issue of material fact with respect to its claims for intentional interference with prospective economic advantage, invasion of privacy, and conspiracy. The Court therefore grants Defendants' motion with respect to those claims.

**C. Prayer for Punitive Damages**

Punitive damages are only available if the plaintiff shows oppression, fraud, or malice by clear and convincing evidence. See Cal. Civ. Code § 3294(a). Malice and oppression are defined as involving "despicable conduct" carried out in "conscious disregard" of the insured's rights. See id. § 3294(c). Evidence that an insurer has breached the duty of good faith and fair dealing is not sufficient to justify a punitive damages award. See Mock v. Michigan Millers Mut. Ins. Co., 4 Cal. App. 4th 306, 329 (1992). The standard California jury instruction defines "despicable conduct" as "conduct which is so vile, base, contemptible, miserable, wretched, or loathsome that it would be looked down upon and despised by ordinary, decent people." 2 Cal. Jury Instr. – Civ. 14.72.1 (9th ed.). Fraud, as defined in § 3294(c)(3) does not require proof of the elements of a cause of action for fraud; rather, it requires an intentional misrepresentation or concealment made with the intent to deprive a person of his rights or to cause injury. Cal. Civ. Code. § 3294(c)(3); Nostrica v. State Comp. Ins. Fund., 70 Cal. App. 4th 911, 948 (1999). Malice includes conduct "which is intended by the defendant to cause injury to the plaintiff." Cal. Civ. Code § 3294(c)(1).

Defendants argue that the Court should dismiss the punitive damages claim because no reasonable jury could find proof that Defendants acted with "malice," "oppresion," or "fraud," by clear and convincing evidence. (Mot. 18:13-16.) Defendants argue that punitive damages are inappropriate because they "relied on medical experts in making the claims decision." (Id. 21:20-21.)

The Court finds that a reasonable jury could find Plaintiff's evidence to be clear and convincing proof of malice, fraud, or oppression. A reasonable jury could conclude that conduct such as sending Plaintiff's medical records to an adverse party indicates an intent to injure plaintiff, and that this was part of an effort to justify denying Plaintiff's claim. The evidence also arguably supports the inference that Defendants conducted a biased and incomplete investigation at a time when Plaintiff was suffering from chronic back pain in combination with a very recent tibial tendon injury that Defendants' expert Dr. Saks acknowledged was not yet close to being healed. The Court therefore denies Defendants' motion with respect to Plaintiff's prayer for punitive damages.

**D. Breach of Contract and Bad Faith Claims Against Paul Revere**

Defendants argue that Plaintiff's bad faith and breach of contract claims against Paul Revere fail as a matter of law because no contractual privity exists.[3] Plaintiff argues that although

[3]Defendants also point out, in passing, that Unum has not been served. (Mot. 23 n.5; Reply 16:18-19.) During oral argument on Defendants' motion, Plaintiff's counsel acknowledged that Unum has not filed any responsive pleading in this case and Plaintiff has not pursued any recourse, such as seeking entry of default or default judgment. The Court therefore finds that Unum is not a party to this action.

"third party administrators" are not liable for breach of contract or bad faith, "Unum purchased the disability blocks of business from General American and Protective Life" and "alter ego liability applies" because Paul Revere is a wholly-owned subsidiary of Unum with no actual employees (Opp. 24:8-12.) Plaintiff has not, however, come forth with evidence to support its claim that Unum is in privity with Plaintiff, nor to establish that alter ego liability applies to Paul Revere. The Court therefore finds that there is no genuine issue of material fact as to Plaintiff's breach of contract and bad faith claims against Paul Revere and grants Defendants' motion in that respect.

**IV. CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion. The Court grants Defendants' motion for summary adjudication with respect to Plaintiff's third through fifth causes of action and its claims for breach of contract and bad faith against Paul Revere. The Court denies Defendants' motion with respect to Plaintiff's bad faith claim against the remaining Defendants and with respect to Plaintiff's prayer for punitive damages.

IT IS SO ORDERED.

Dated: October 1, 2009

DEAN D. PREGERSON
United States District Judge